UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UTU UTU GWAITU PAIUTE TRIBE OF THE BENTON PAIUTE RESERVATION, et al., | No.  2:26-cv-02323-DAD-JDP |
| Plaintiffs, | ORDER DENYING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER |
| v. | (Doc. No. 4) |
| UNITED STATES DEPARTMENT OF THE INTERIOR, et al., | |
| Defendants. | |

This matter came before the court on July 6, 2026 for hearing on plaintiffs' motion for temporary restraining order to enjoin defendants from removing wild horses from in or around the Montgomery Pass Wild Horse Territory.  (Doc. Nos. 4, 11.)  Attorney Stephanie Brooks Sherman appeared by Zoom on behalf of plaintiffs—the Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation, Tribal Chairman Shane Saulque, and Tribal Historic Preservation Officer and Cultural Monitor Ronda Kauk.  U.S. Department of Justice Trial Attorney Young Kang appeared by Zoom on behalf of defendants—the United States Department of the Interior, the United States Bureau of Land Management ("BLM"), Secretary of the Interior Douglas Burgum, BLM Director Steve Pearce, the United States Department of Agriculture, Secretary of Agriculture Brooke L.

/////

1

Rollins, the United States Forest Service ("USFS"), Mono Lake District Ranger for Inyo National Forest Stephanie Heller, and Acting Field Manager of BLM Bishop Field Office Heather Stone.

For the reasons explained below, plaintiffs' motion for temporary restraining order will be denied.

## BACKGROUND

**A.      Factual Background**[1]

The wild horse territory at issue encompasses 207,921 acres in California and Nevada, east of Mono Lake, bounded by State Highways 6 and 120.  (Doc. No. 4 at 6.)  The plaintiff tribe's reservation sits at the southeastern corner of the wild horse territory, within the defendants' project area boundary.  (*Id.*)  The territory and removal area constitute the ancestral homeland of the plaintiff tribe's people and contains burial grounds, ceremonial springs, petroglyph sites, bedrock mortar sites, pinyon harvesting areas, travel corridors, and other tribal cultural resources.  (*Id.*)

On October 4, 2023, BLM and USFS sent form letters simultaneously to more than twelve tribes.  (Doc. Nos. 4 at 7; 8-1 at 2.)  Tribal Chairman Saulque ("Chairman Saulque") responded one day thereafter protesting the proposed wild horse gather and requesting a meeting.  (Doc. Nos. 4 at 7; 8-1 at 2.)  On the same day, October 5, 2023, a Forest Service District Ranger spoke on the phone with Chairman Saulque.  (Doc. No. 8-1 at 2.)  On October 6, 2023, the Forest Service District Ranger sent a follow-up email to Chairman Saulque about setting a meeting, but no response was received.  (*Id.*)  On October 31, 2023, the Forest Service District Ranger sent a follow-up email to Chairman Saulque again about setting up a meeting, but no response was received.  (*Id.*)

On December 14, 2023, the Forest Service Tribal Relations Program Manager sent an email to Chairman Saulque requesting communication and consultation in December of 2023 or January of 2024, but no response was received.  (*Id.*)  On February 23, 2024, a BLM Field Manager sent an email to Chairman Saulque requesting a telephone call, a meeting, or to attend

---

[1]  This factual background is based upon the undisputed portions of plaintiffs' motion for temporary restraining order background section and the exhibits attached to the parties' briefing.

Tribal Council to discuss the wild horses, but no response was received.  (*Id.*)  On February 26, 2024, the BLM Field Manager called the Benton Tribal Office in an attempt to reach Chairperson Saulque, leaving their name, title, and phone number with the receptionist and requesting a call back, but no response was received.  (*Id.*)  On February 28, 2024, the BLM Field Manager called the Benton Tribal Office attempting to reach Chairperson Saulque, leaving the same contact information with the receptionist, but no response was received.  (*Id.* at 3.)

On April 19, 2024, the Forest Service sent an email to various tribes requesting RSVPs to join a field visit of key areas regarding the proposed gather areas, but no tribes RSVP'd for the date and time offered.  (*Id.*)  On May 16, 2026, the Forest Service, Inyo National Forest, held a quarterly tribal meeting with the wild horses issue on the agenda, but the plaintiff tribe did not attend the meeting.  (*Id.*)  On May 24, 2024, the Forest Service and BLM emailed and sent certified joint letters to the chairperson and staff of thirteen individual tribes and tribal communities, including the plaintiff tribe, regarding the review and comment period with respect to the Preliminary Environmental Assessment that had been posted on May 28, 2024.  (*Id.*)  On August 6, 2024, the Forest Service sent out emails to the chairperson and staff of thirteen individual tribes and tribal communities, including the plaintiff tribe, regarding the 45-day objection filing period for the Draft Decision Notice and Final Environmental Assessment / Finding of No Significant Impact.  (*Id.* at 3–4.)  The Final Environmental Assessment ("EA") was then released on August 8, 2024.  (Doc. No. 4 at 6.)

On November 15, 2024, Chairman Saulque attempted to enter the Inyo National Forest TEAMS objection resolution meeting.  (Doc. No. 8-1 at 4.)  Defendant Stephanie Heller responded with an email explaining those who are eligible to attend protest meetings, but offering a meeting with the plaintiff tribe.  (*Id.*)  On November 21, 2024, Inyo National Forest held the quarterly Tribal meeting with the wild horses issue on the agenda.  (*Id.*)  The plaintiff tribe was invited to that meeting but did not attend.  (*Id.*)  On December 15, 2024, Big Pine Paiute Tribe hosted a Montgomery Pass Wild Horse Territory Gather Tribal Meeting at the tribe's Council Chambers.  (*Id.*)  Plaintiff tribe councilwoman Jolene Carley attended that meeting.  (*Id.*)

/////

3

On January 16, 2025, there was a tribal consultation meeting held at a BLM/USFS building where the agencies provided a presentation of the proposed project, the legal framework for gathers of wild horses outside the territory, and a timeline for the agencies' decision in that regard. (*Id.* at 5.) Plaintiff tribe's Vice Chairman Rayna Saulque and Councilmember Jolene Carley attended and expressed concern about humane treatment of the wild horses and a desire to increase the territory boundary. (*Id.*) In response, the agencies stated that they follow protocols to ensure humane treatment of the wild horses and that increasing the territory would not meet the purpose and need for the project and the legal framework for the proposed action. (*Id.*)

A Finding of No Significant Impact ("FONSI") and Decision Record ("DR") was issued on March 7, 2025 by the BLM. (Doc. No. 4 at 6.) The 2025 DR determined that 624 of 694 documented wild horses were "excess" and directed that all 624 "must be removed." (*Id.*) The DR also stated that "Tribal Consultation is ongoing, [and] therefore, concerns regarding Traditional Cultural Properties, Sacred Sites[,] or issues of Tribal concern in the project area will continue to be considered." (Doc. No. 4-4 at 7.) On the same day the DR was issued, USFS and BLM emailed joint letters regarding the Final Decision to the chairperson and staff of thirteen individual tribes and tribal communities including the plaintiff tribe. (Doc. No. 8-1 at 5.)

On August 12, 2025, Chairman Saulque sent a letter outlining several concerns with the wild horse gather and formally requesting that defendants delay the gather. (Doc. No. 8-2 at 4.) In response, defendants proposed three different blocks of time in October and November 2025 for immediate consultation. (*Id.* at 3.)

On April 23, 2026, plaintiff Kauk invoked the National Historic Preservation Act ("NHPA"), § 106 by name and requested consultation. (Doc. No. 4 at 7.) On May 8, 2026, defendant Heller responded that she was awaiting guidance from the Office of General Counsel and Department of Justice as to "if [ongoing litigation] will affect our ability to consult." (*Id.*) A consultation meeting proposed by defendant Heller for May 19, 2026 was never held because plaintiffs canceled the meeting. (*Id.*) Plaintiff Kauk stated as follows:

> Please disregard my previous email regarding the meeting scheduled for 5/19/2026.

4

> After further consideration, we would like to cancel the meeting at this time. We understand there is [sic] limitations regarding what can be discussed due to ongoing legal considerations, and we currently need to focus our attention on other immediate priorities related to our work and consultation efforts. We appreciate your time and willingness attend the meeting we call for tomorrw [sic] and we remain open to future communication if circumstances change and there is an opportunity for more productive and substantive discussion moving forward.

(Doc. No. 8-4 at 4.)

On May 14, 2026, plaintiffs' counsel sent a formal written demand for § 106 compliance, attaching an eight-page Required Agenda for Government-to-Government Consultation citing the governing regulations by number. (Doc. No. 4 at 7.) Defendants never responded to that letter. (*Id.*)

Defendants state that they announced the wild horse gather on June 22, 2026. (Doc. No. 8 at 8.) Plaintiffs filed their complaint initiating this action on June 29, 2026. (Doc. No. 1.) Plaintiffs state that they received notice on July 2, 2026—the same day the motion for temporary restraining order was filed—that defendants had moved the removal date to July 7, 2026, one day earlier than the defendants had previously represented to plaintiffs. (Doc. No. 4 at 2.) Plaintiffs also state that a July 2, 2026 press release issued by USFS announces that only 450 wild horses will be removed, and defendants confirm this number, explaining that this is the maximum capacity of their contractors. (Doc. Nos. 4 at 13; 8-6 at 4.) Defendants represent that while preparations for the gather will begin July 7, removal of the wild horses will not begin until July 8, 2026, as originally planned. (Doc. No. 8 at 8 n.4.)

**B.     Procedural Background**

As noted above, plaintiffs filed their complaint initiating this action on June 29, 2026 (Doc. No. 1), and on the evening of July 2, 2026, filed their pending motion for temporary restraining order (Doc. No. 4). The court directed plaintiffs to serve defendants with the motion for a temporary restraining order and set a deadline for defendants to file their opposition. (Doc. No. 5.) On July 3, 2026, plaintiffs' counsel filed a declaration regarding service. (Doc. No. 6.) That same day, defendants' counsel entered a special notice of appearance, contesting the efficacy of service. (Doc. No. 7.) On July 4, 2026, defendants filed their opposition to the motion for

5

temporary restraining order.  (Doc. No. 8.)  On July 5, 2026, plaintiffs filed a reply thereto and a supplemental certification regarding proof of service.  (Doc. Nos. 9, 10.)  On July 6, 2026, plaintiff filed a notice of filing a supplemental exhibit in support of the pending motion.  (Doc. No. 12.)

**LEGAL STANDARD**

The standard governing the issuing of a temporary restraining order is "substantially identical" to the standard for issuing a preliminary injunction.  *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  "The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'"  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.'"); *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).  A plaintiff seeking a preliminary injunction must make a showing on all four of these prongs.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  The Ninth Circuit has also held that "[a] preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor."  *Id.* at 1134–35 (citation omitted).  The party seeking the injunction bears the burden of proving these elements.  *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citation omitted) ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief.").  Finally, an injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.

/////

6

The likelihood of success on the merits is the most important *Winter* factor.  *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).  Plaintiff bears the burden of demonstrating that he is likely to succeed on the merits of his claims or, at the very least, that "serious questions going to the merits were raised."  *All. for Wild Rockies*, 632 F.3d at 1131.

**ANALYSIS**

Plaintiffs argue that they are likely to succeed on the merits of this action because defendants were required to consult with them regarding the planned removal of the wild horses in accordance with the NHPA, § 106, and yet defendants have failed to do so.  (Doc. No. 4 at 2.)  Plaintiffs also briefly argue that 2024 census data is outdated and cannot support a lawful excess determination as to the wild horse population.  (*Id.* at 13.)

In their opposition, defendants advance four main arguments regarding service of process,[2] plaintiffs' failure to engage in the consultation process, plaintiffs' failure to establish irreparable harm in the absence of preliminary relief being granted, and the 2024 wild horse census data.  (Doc. No. 8.)

**A.    The Consultation Process**

Plaintiffs argue that defendants repeatedly failed to engage in the required § 106 consultation process.  (Doc. No. 4 at 2.)  The core evidence upon which plaintiffs rely in this regard is the 2025 Decision Record, in which BLM stated that "Tribal Consultation is ongoing, [and] therefore, concerns regarding Traditional Cultural Properties, Sacred Sites or issues of Tribal concern in the project area will continue to be considered."  (Doc. No. 4-4 at 7.)  According to plaintiffs, "[t]his is the Agencies' concession that the Section 106 process was never finished[]" since defendant Heller "signed the 2025 [Decision Record] on March 7, 2025 and has

---

[2]  Defendants argue that plaintiffs have failed to serve them in compliance with Federal Rule of Civil Procedure 4.  (Doc. No. 8 at 2–5); *see* Fed. R. Civ. P. 4(i).  Accordingly, defendants argue, this court lacks personal jurisdiction over defendants and cannot grant injunctive relief against them.  (*Id.*)  In light of Federal Rule of Civil Procedure 65(b)(1), the court is skeptical of defendants' argument that Rule 4 service is required prior to any temporary restraining order.  *See Boza v. Bondi*, No. 25-cv-03526-AGS-SBC, 2025 WL 3638138, at *1 (S.D. Cal. Dec. 15, 2025) (detailing a split of authority on this issue).  However, the court need not decide this question because it concludes that plaintiffs have not met their burden to justify the issuance of a temporary restraining order.

never retracted or amended her admission of incompleteness." (Doc. No. 4 at 6.)  Plaintiffs further argue that:  in October 2023, they responded to defendants' form letter regarding consultation within a day, yet no meeting was scheduled for the following 15 months; in November 2024 Chairman Saulque was turned away from the Forest Service's objection resolution meeting; and defendants represented that any meeting with plaintiffs would be a "listening session" only and meeting topics would be limited due to ongoing litigation.

When questioned about this evidence at the July 6, 2026 hearing, defendants' counsel contended that the statement in the 2025 Decision Record was not an admission that the mandated § 106 process was incomplete but rather a statement that defendants intended to continue consulting above and beyond that consultation which was required.  Defendants' counsel also argued that:  defendants repeatedly attempted to contact plaintiffs to set up consultation meetings but were largely ignored; Chairman Saulque was turned away from the objection resolution meeting because he had not submitted objections at the designated time and the meeting was designed for those who had done so in order to discuss their timely submitted objections with defendants; and at one point defendants represented to plaintiffs that meeting topics *may* be limited by ongoing litigation but didn't have a chance to provide a definitive answer regarding whether and to what extent they would be limited before plaintiffs canceled the May 19, 2026 meeting.

Defendants argue that because they repeatedly attempted to consult with plaintiffs, but plaintiffs failed to engage in the consultation process, defendants have satisfied their duty under § 106.  (Doc. No. 8 at 6.)  More specifically, defendants offer evidence that plaintiffs largely ignored defendants' repeated emails and telephone calls attempting to set up consultation meetings.  (*See* Doc. No. 8-1 at 2–5) (chronological tribal consultation log).  Ultimately, when it appeared that such a meeting had been agreed upon and would finally take place on May 19, 2026, plaintiff Kauk canceled the meeting and declined to reschedule it unless "circumstances change[d.]"  (Doc. No. 8-4 at 4.)

/////

/////

8

When the court inquired at the hearing, plaintiffs' counsel explained that plaintiffs had cancelled this meeting after defendants had unfairly limited it to being a "listening session" only[3] with the topics to also be limited due to ongoing litigation.  As to why the plaintiffs had not responded to many of defendants' attempts to have contact with them in the preceding years, counsel explained that the plaintiff tribe is a small one without significant resources.

The court finds based upon the evidence currently before it that defendants did make repeated attempts to consult with plaintiffs as required, yet plaintiffs did not respond to those efforts and ultimately canceled the May 19, 2026 consultation meeting defendants had attempted to set.  While the size and limited resources of the plaintiff tribe provide some explanation, that does not alter the fact that it appears defendants made significant efforts to satisfy their consultation obligation.  Accordingly, the court concludes plaintiffs have failed to show that they are likely to succeed on the merits of their § 106 claim, or that serious questions going to the merits of that claim have been raised.  *See Apache Survival Coal. v. United States*, 21 F.3d 895, 907 (9th Cir. 1994) ("It is clear, then, that the Tribe ignored the *very process* that its members now contend was inadequate.  In these circumstances, we believe that laches should not be measured not from the date of the relevant agency action, in this case issuance of the Special Use Permit, but from the onset of the NHPA review process, beginning with the Forest Service's first attempts to elicit the Tribe's input in 1985."); *Reno-Sparks Indian Colony v. Haaland*, 663 F. Supp. 3d 1188, 1196–97 (D. Nev. 2023) ("SLPT accordingly told BLM it did not wish to be consulted on a project both in the same area as the Project and with the same general subject matter—lithium extraction.  This could have been a reasonable basis for BLM not to consult with SLPT on the Project.  But BLM nonetheless did attempt to consult with SLPT on the Project.  In addition to publishing notices in the Federal Register, BLM sent SLPT four letters between December 2019 and the time it issued the ROD.  SLPT did not respond to any of these letters.  BLM could reasonably infer from SLPT's nonresponse to these letters—coupled with the earlier

_____

[3]  While plaintiffs characterized this statement to mean that only defendants would speak at the meeting, the court's review of the email in question (Doc. No. 12 at 3–4) suggests that defendants may well have intended the opposite meaning, that the plaintiff tribe was free to share their concerns but defendants would be limited in what they could say due to the ongoing litigation.

9

statements from SLPT members that they did not wish to be consulted on projects in the same geographic area as the Project—that it did not need to inquire further or more forcefully with SLPT.  It is also notable that SLPT acknowledges receipt of three of these letters but offers no specific explanation as to why it did not respond to them."); *Grand Canyon Tr. v. Williams*, No. 13-cv-08045-PCT-DGC, 2015 WL 3385456, at *6 (D. Ariz. May 26, 2015) ("Equity is not served when the Tribe refuses to consult with the Forest Service about protecting its religious interests and then seeks an injunction to protect those same interests on the ground that the Forest Service has failed to consult.").

**B.     The 2024 Census Data**

Plaintiffs argue that 2024 census data cannot support a lawful excess determination as to the wild horse population.  (Doc. No. 4 at 13.)  Defendants argue that plaintiffs have failed to establish a likelihood of success on the merits of this claim because another judge of this court has recently found that reliance on this data is not arbitrary and capricious.  (Doc. No. 8 at 5 n.3) (citing *Tobin v. Rollins*, No. 2:25-cv-02259-CSK, 2026 WL 480770 (E.D. Cal. Feb. 20, 2026), appeal pending No. 26-2673 (9th Cir. Apr. 29, 2026)).  Indeed, in *Tobin*, "the Court [found] that [the d]efendants made a proper 'excess' determination, a prerequisite to removal under the Wild Horse Act[]" where the defendants "relied on 'currently available' information by relying on census flights as recent as 2024 of wild horses as they migrated inside and outside the Territory[.]" *Tobin*, 2026 WL 480770, at *6.  This finding includes a conclusion that the 2024 census data is not outdated and can support a lawful excess determination, contrary to plaintiffs' argument advanced in this action.  Accordingly, the court finds that plaintiffs are not likely to succeed on the merits of their claim regarding the 2024 census data, nor do they raise serious questions going to the merits of that claim.[4]

/////

/////

---

[4]  Because the court finds that plaintiffs have not raised serious questions going to the merits, the court need not address the remaining factors, including irreparable harm, the balance of equities, or the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

**CONCLUSION**

For the reasons explained above, plaintiffs' motion for temporary restraining order (Doc. No. 4) is DENIED.

IT IS SO ORDERED.

Dated:    **July 7, 2026**

_____
DALE A. DROZD
UNITED STATES DISTRICT JUDGE

11